```
1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    IP VENTURE INC              :    CA NO. 11-588-RGA

5                                :    June 27,2012

6         Plaintiff,        :

7                                :    2:00 O'clock p.m.

8    v.                          :

9                                :

10   DELL INC, ET AL             :

11                               :

12        Defendants,       :

13   ............................:

14

15

16       TRANSCRIPT OF MOTIONS TO SEVER AND TRANSFER

17      BEFORE THE HONORABLE RICHARD G. ANDREWS

18              UNITED STATES DISTRICT JUDGE

19

20

21   APPEARANCES:

22

23   For Plaintiff:      BLANK ROME

24                       BY:  STEVE L. CAPONI, ESQ

25                            -and-
```

```
 1                        IRELL & MANELLA LLP

 2                        BY:  DORIAN S. BERGER, ESQ

 3

 4

 5   For Defendants:     ASHBY & GEDDES

 6                        BY:  JOHN G. DAY, ESQ

 7                             -and-

 8                        PERKINS COIE LLP

 9                        BY:  MICHAEL J. ENGLE

10                        For Defendant ASUS

11

12                        RICHARDS, LAYTON & FINGER

13                        BY:  STEVEN J. FINEMAN, ESQ

14                             -and-

15                        WINSTON & STRAWN

16                        BY:  KIMBALL ANDERSON, ESQ

17                        BY:  HOWARD I. SHIN, ESQ

18                        For Defendant Dell

19

20                        PHILLIPS, GOLDMAN & SPENCE

21                        BY:  JOHN C. PHILLIPS, ESQ

22                        For Defendant Lenovo

23

24

25
```

1

2

3      Court Reporter:              LEONARD A. DIBBS

4                                   Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        P R O C E E D I N G S

3

4              THE COURT:  Good afternoon.  Please be seated.

5         Who have we got here?

6              MR. CAPONI:  Good afternoon, your Honor.  Steve Caponi

7    from Blank Rome for plaintiff IpVenture.  With me is Dorian

8    Berger from Irell & Manella who will be presenting our position

9    today.

10             THE COURT:  All right.  Thank you.  Mr. Berger,

11   welcome.

12             MR. FINEMAN:  Good afternoon, your Honor.  Steve

13   Fineman from Richards Layton & Finger.

14             Sitting with me at counsel table is Kimball Anderson

15   and Howard Shin from Winston & Strawn.

16             Mr. Anderson will be addressing the Court today.

17             THE COURT:  Mr. Anderson, Mr. Shin, welcome.

18             MR. ANDERSON:  Thank you.

19             MR. DAY:  Good afternoon, your Honor.

20             John Day from Ashby & Geddes, Delaware counsel for the

21   ASUS defendants.  With me today is Michael Engle from Perkins

22   Coie's Los Angeles office, who is lead counsel for ASUS.

23             Mr. Engle plans to speak on behalf of the ASUS

24   defendants.

25             THE COURT:  Mr. Phillips, no need to come forward.

1      MR. PHILLIPS:  Good afternoon, your Honor.  John

2  Phillips on behalf of Lenovo U.S.

3      THE COURT:  All right.

4      So, I think I scheduled the argument on sort -- what I

5  had in mind when I was scheduling the argument was on the

6  Motions to Sever and Transfer.

7      Somewhere along the line, I noticed there were quite a

8  few other motions pending in this case.

9      So what I thought I was going to do was tell you what I

10  was thinking of doing so that maybe that would help focus.  But

11  this is all tentative.

12      Tentatively, I'm going to sever Dell and ASUS.  I'm

13  going to transfer ASUS to the Northern District of California.

14  I'm not going to transfer Dell.

15      Just on the other motions that are pending, I'm

16  probably going to grant all the ones to dismiss the infringement

17  by inducement and contributory infringement.

18      I'm probably going to deny the Motion to Dismiss for

19  Direct Infringement.

20      I'm not so sure what I'm going to do about the

21  willfulness motions.

22      So that presents a target for everybody to argue

23  against or for depending on your position is.

24      First off, do the parties have an order in which they

25  wanted to go, or are you going to do whatever I ask?

1          MR. ANDERSON:  We'll do whatever you ask.  We talked

2     among ourselves over here.  I'm prepared to go first.

3          THE COURT:  You're Dell, right?

4          MR. ANDERSON:  I'm Dell.

5          THE COURT:  Basically, I would say you have ten

6     minutes.

7          MR. ANDERSON:  All right.

8          Thank you.  May it please the Court.  I appreciate the

9     privilege of appearing here today.

10          Your Honor obviously has given the papers considerable

11     thought and I can tell from reading your other decisions, this

12     is not your first venture with severance and transfer motions.

13          I'm not going to gild the lilly.  And under the

14     circumstances, I don't think I'm going to say much about the

15     severance issue, other than I was going to say that I think it's

16     pretty much a foregone conclusion after the AIA and EMC.  There

17     are simply no allegations in this Plaintiff's Amended Complaint,

18     the defendants are jointly, severally or alternatively liable.

19          THE COURT:  Dell was named in the original Complaint,

20     right?

21          MR. ANDERSON:  We were not.

22          THE COURT:  You were not, okay.

23          I was curious.  Maybe it was in the papers and I didn't

24     see it.  Somebody cited something.

25          But the question of whether the AIA applies to the

1   defendants who were added that weren't in the original

2   Complaint, who were added after the effective date.

3           Has some court squarely decided whether the AIA applies

4   or not, or is that still pretty much a question of first

5   impression?

6           MR. ANDERSON:.  I haven't seen any authority on it.  We

7   believe the AIA does apply to Dell.  IP Venture did not really

8   disagree.

9           THE COURT:  I thought they did.

10          MR. ANDERSON:  I didn't see it in their papers.

11          THE COURT:  Do you disagree?

12          MR. BERGER:  Yes.

13          THE COURT:  That's what I thought.

14          I saw it somewhere.  Part of it, I guess, two responses

15  and the two cases mixed up.  Maybe it was in the ASUS one.  I'm

16  not sure.  In any event, go ahead.

17          MR. ANDERSON:  I'll just add this without gilding the

18  lilly.  There is the two prong test in the AIA.  Prong number

19  one, joint, several or alternative liability, and, two, common

20  issues of fact and law.  Those are the same two prongs that are

21  in Rule 20.

22          No matter how you slice it, there's no allegation in

23  this Amended Complaint that Dell is jointly, severally, or

24  alternatively liable with any of its co-defendants, nor could

25  there be.  We're all competitors.  We're accused of -- for the

1    accused products, we're accused of manufacturing, selling Dell

2    products not somebody else's.

3         THE COURT:  They don't say you're jointly and severally

4    liable.  Their theory on that is, you get from somebody else

5    components such as fans and processors and this and that, which

6    maybe are the same components that are in ASUS's computers.

7         MR. ANDERSON:  They do.  But the same component

8    argument does not equate to the same product test and the

9    statute and rule.  If it did, it would simply eviscerate the act

10   and the rule, because every plaintiff in a patent case can cite

11   some common component that maybe used in the infringing product

12   such as automobiles have wheels, computers have processors and

13   fans.

14        That can't be the test.  Even if you accept that it is,

15   at best it addresses the second prong of the test, which is a

16   common question of fact and law.  It does not begin to address

17   the first prong, which is joint, several or alternative

18   liability.

19        I don't want to gild the lilly here, but there is no

20   joint liability.  We're not acting jointly to cause a common

21   injury.  There is no several liability.  That arises when

22   parties by contract divide up their liability.

23        There is no alternative liability.  That's a theory of

24   liability when two actors acting independently injure somebody,

25   but you can't tell who caused the injury.  Like two people fire

1   a bullet and only one of them hits the plaintiff.  There is no

2   burden on the defendant to show that the other guy did it.

3       There isn't any underlying theory.  There isn't any

4   allegation to that effect.

5           THE COURT:  Why don't we go on to the transfer.  That's

6   where you have to convince me of something.

7           MR. ANDERSON:  Sure, sure.

8           I've read your other decisions on transfer.  And I

9   think one of the most recent ones is the InvestPic case.

10          I would suggest, respectfully, that this is a more

11  compelling case for transferring Dell than the InvestPic case.

12          First of all, unlike in InvestPic, the plaintiff here

13  is not a Delaware corporation.  They have no operations here at

14  all.  They are in California.

15          Secondly, this plaintiff, this is not a mom and pop, or

16  David and Goliath situation where there is any great

17  inconvenience on IpVenture to be litigating in another forum.

18          IpVenture is a mass aggregator of patents.  They report

19  to own many, many.  I just went to their website.

20          THE COURT:  I saw IpVenture and what they said about

21  themselves.  Some Cal Tech grad and Mr. Thomas were the company

22  more or less.

23          And I saw somebody said, you know, they have one office

24  in the world.  It's somewhere near Campbell, California.  So

25  maybe they have a lot of patents.

1          Are they a big company?

2          MR. ANDERSON:  We haven't had any discovery on that.

3          I can make some inferences that I think are helpful

4     here.  If you go to their website, they say that --

5          THE COURT:  Actually, their website, is that part of

6     the record right now?

7          MR. ANDERSON:  I don't believe it is.  I would be happy

8     to make this an exhibit and hand it up to you.  I printed it off

9     the web a couple of days ago.

10         THE COURT:  Have you given a copy to IpVenture?

11         MR. ANDERSON:  Sure.  I'll give them a copy.  It is not

12    long.

13         I can tell you that they appear to be a mass aggregator

14    of patents.  They are a non-practicing entity.  They appear to

15    be in the business of licensing.

16         Here's a quote off their website, "We are currently

17    licensing technologies in location-based devices and services,

18    hydration, sensor, electronic eyewear, hair sensor, smart

19    headset, thermal management, and online order fulfillment.  If

20    you are interested in these technologies, please contact us."

21         And I can also tell you that a search of the Federal

22    Court's Pacer System shows that IpVenture is a regular user of

23    the Federal Court system.  There are at least five IP cases that

24    I can see on Pacer where IP Ventures is suing.  Two of them are

25    in the Central District of California.  One is in the Central

1    District of California.  Two in the Northern District of

2    California.  And two are here in Delaware.

3            And they are represented in almost every case by large

4    law firms like Irell Manella.

5            So this is not some mom and pop outfit.  This is a mass

6    aggregator.

7            I don't know if you had a chance to read, Judge, a

8    recent Stanford technology Law Review entitled, The Giants are

9    among us, if you want, it's easily accessible on the web.

10           These mass aggregators of patents exercise considerable

11   market power.  They are extremely well funded.

12           And I think all of the available evidence shows that

13   IpVenture is one of those entities capable of litigating

14   anywhere in hiring the best and, in some cases, some of the

15   largest law firms to represent themselves.  That's another

16   distinguishing fact from the InvestPic case.

17           Delaware is obviously not IpVenture's home court, home

18   turf.

19           THE COURT:  But neither is Texas?

20           MR. ANDERSON:  Yes, that is absolutely true.  Texas is

21   Dell's choice for good reason, our witnesses are there.

22           We have submitted a Declaration that based upon our

23   investigation our critical witnesses live and work in Texas,

24   Western District.

25           Here's the problem and it's a serious problem.  Three

1    of the most critical witnesses no longer work for us, okay?

2    These are the people who are thermal management experts, who are

3    -- who basically are most knowledgeable about the accused

4    products.

5            THE COURT:  I'm sorry.  In your Declarations, whatever,

6    do you name who these three people are?

7            MR. ANDERSON:  Yes, we did.  I can name them here for

8    the record.  They are Michael Heatley, Chris Jaggers, Roberto

9    Prosperi.

10           We've investigated, we've interviewed and we have

11   determined that these are the people who are most knowledgeable

12   about the accused products.

13           We've also determined that they don't work for Dell

14   anymore.  We further determined that maybe unlike some of the

15   other defendants, Dell has its own patented thermal management

16   technology.  And that is the crux of these patents.  It's a

17   thermal management technology.  We have our own patent.

18           Now, I realize as a legal matter that's not a technical

19   defense of patent infringement, but it's highly relevant because

20   it explains the operation and design of the accused product.

21           And Mr. Prosperi, who I mentioned, is the inventor on

22   one of these critical Dell thermal management technology.

23           THE COURT:  When you said the accused product, if I

24   recall, the accused product was described pretty broadly?

25           MR. ANDERSON:  That is a problem.  They basically

1    accused a wide swath of notebooks and desktops that have thermal

2    management functionality in them.

3           THE COURT:  I guess what I was wondering is, if I

4    recall correctly, didn't they say the accused product is Dell

5    notebook computers or something like that?

6           MR. ANDERSON:  They have.  It's not much more specific

7    than that.

8           THE COURT:  I guess what I'm wondering is, how do you

9    know these -- I guess what I'm wondering is, how do you know

10   these three guys are actually relevant to what it is that they

11   are pursuing?

12          MR. ANDERSON:  Because the accused products are using

13   what we call the Dell Thermal Management System.  And these are

14   the guys that designed it.  One of them got a patent on it.

15          THE COURT:  Okay.

16          MR. ANDERSON:  It's kind of a legacy.

17          THE COURT:  Are these three now located in Texas?

18          MR. ANDERSON:  They live and work in the Austin, Texas

19   area.  Dell is headquartered in Round Rock, Texas.

20          Round rock is about 20 miles north of Austin.  Both

21   cities are squarely within the United States District Court for

22   the Western District of Texas.

23          And we have also investigated, whether by contract or

24   other means, we have the ability to compel these critical

25   witnesses to come to Delaware.  And we don't believe so because

1    they have other jobs.  They don't have any obligation to come to

2    Delaware.  So this puts Dell at a disadvantage.

3          If you look at Delaware vs Texas, there is no literally

4    no connection with Delaware in this case other Dell is

5    incorporated here.

6          But that factor is more than offset, if not neutral, by

7    the fact that our witnesses and documents are in the Western

8    District of Texas.

9          And it is certainly not offset by any argument by

10    IpVenture that Delaware is the home turf for them.  It's

11    obviously not.

12          Unlike InvestPic, they are not even incorporated here.

13    Furthermore, a little more work on Google shows that Austin,

14    Texas is about a thousand miles closer to IpVenture than

15    Wilmington, Delaware.  It is actually closer.

16          THE COURT:  Is that your best argument for transferring

17    the matter to Texas, these three individuals?

18          MR. ANDERSON:  I think if I had to rank the arguments,

19    I think that is our best argument.

20          I think it is a compelling argument, because one of the

21    most important Jumara factors and other factors that the courts

22    discuss under 28 USC 1404(a) is, where are the witnesses and

23    where are the documents?  Whose ox is going to be gored if they

24    have to travel to some other jurisdiction where they have little

25    or no contact with.

1          And so I think that is the best argument.  There are

2     others.  But often cited is court congestion.  I know your Honor

3     has expressed the intent and desire and will to move your cases

4     along.

5          If you look at the congestion factors in the two

6     districts, there is a big, big difference.

7          THE COURT:  I've been thinking about why this doesn't

8     impress me much.  Part of it is, when you see these statistics,

9     you always have to read them very carefully and say, What is it

10    exactly that they are stating, taking them as literally true.

11         So, for example, when they say the average time to

12    trial in this district is this, the average in the other

13    district is this.  One of the questions you might want to know

14    is, what kind of things are actually going to trial?

15         MR. ANDERSON:  I totally agree.  You cannot be overly

16    reliant on statistics.

17         However, if you read the Juris Prudence under 1404(a)

18    decisions, that is one of the factors.  And those are the kinds

19    of --

20         THE COURT:  I agree.  It's one of the factors.

21         MR. ANDERSON:  Let me conclude by saying, I think this

22    case looks like an awful like that Link_A_Media case, where

23    there the only arguments the plaintiff had was that the

24    defendant was incorporated in Delaware and had chosen Delaware.

25         But here, that choice of forum by the plaintiff is

1    entitled to little or no weight when this is not their home

2    turf.  Under 1404(a), I think this looks an awful lot like In re

3    Link_A_Media.

4            THE COURT:  The main differences for your client is if

5    IpVenture had its headquarters in Austin, Texas, Yeah, you'd be

6    right.  Their headquarters is a long ways away.

7            MR. ANDERSON:  Closer to Austin than here.

8            THE COURT:  That was kind of the distinguishing feature

9    in Link_A_Media, in essence, you had one Northern District of

10   California corporation suing another Northern District of

11   California corporation.  That's ASUS, but not Dell.

12           MR. ANDERSON:  That's true.  All these cases have some

13   meaning facts.

14           I think this case at least as far as Dell is concerned,

15   there is a compelling reason to transfer it to Texas.  That's

16   where our critical witnesses are.

17           And it unfairly prejudices us if I have to try this

18   case by videotape deposition.  That's just not fair.  And there

19   is no other strong connection with the State of Delaware.

20           THE COURT:  I take it the three witnesses you've

21   mentioned, they are identified in a declaration submitted with

22   your brief?

23           MR. ANDERSON:  They are, your Honor.

24           We have a Declaration.  And we call out the names and

25   what then by way of facts we believe, in our belief that they

1    reside and now work in the Western District of Texas.

2              THE COURT:  Okay.  All right.  Thank you.

3              MR. ANDERSON:  You're welcome.

4              THE COURT:  Why don't I hear from IpVenture on your

5    argument?

6              Mr. Berger.

7              MR. BERGER:  Thank you, your Honor.

8              I think I'd first like to address the severability

9    issues before going to the transfer issues.

10             On the severability, there were a number of issues that

11   have come to the floor in the wake of EMC.  That was the opinion

12   that was issued by the Federal Circuit, which kind of gives a

13   way in which to interpret joinder of different parties.

14             In that case, the court provided six bases for

15   considering whether joinder was appropriate at the time in order

16   to find out if the individuals were part of the same transaction

17   and occurrence.

18             And this is near the end of the opinion in which the

19   court states -- provides the six basis.  The first is that --

20   the factors are first, that the infringement occurs during the

21   same period and that there is a relationship between the

22   defendants.

23             THE COURT:  Right.  I just brought the case with me.  I

24   know what you're referring to.  I just couldn't find it in the

25   various piles of papers.

1       MR. BERGER:  It's on the last page of the case.

2       Also what this case does is point out that the joinder

3   rules really provide two different basis.

4       And this is also true when you look at the AIA, which

5   is you can either have joint liability as a reason to join

6   defendants together or that they can be partaking in the same

7   transaction or occurrence.

8       THE COURT:  I agree with you on that.

9       MR. BERGER:  Okay.

10      In the case of transaction and occurrence, these are

11  very much heavily factual issues in order to determine whether

12  they are correct.  That's really what EMC is saying.  They

13  provide these six factors to look at.

14      IpVenture's position at this point in the litigation,

15  when we know very little about how defendants' products are

16  manufactured, we have some information that's publicly available

17  and also who's actually manufacturing and the components that

18  are going into it.

19      We believe that a lot of the components are identical

20  between the manufacturers.  They are using the same Intel chips,

21  the same microprocessors, the same fans.

22      And also in some information that we've seen online,

23  they are actually being manufactured by the same companies.

24      THE COURT:  Isn't your theory that they get the fans

25  from one supplier and they get the processors from another and

1    they get the electrical switches from another?

2            MR. BERGER:  The theory is actually even more relevant,

3    because what our theory is that companies like Foxconn, Quanta,

4    and Winstron actually go out and source all these different

5    materials and put them together in their factories back in

6    China, the Far East and import them back into the United States.

7            At the point they are coming into the United States,

8    they are giving different types of packaging.  But functionally,

9    the products actually work in an identical manner.  That is

10   something that additional discovery will tell us more

11   information about.

12           THE COURT:  Presumably, before you brought this suit,

13   you got a notebook computer from each of these people and you

14   went through them.  Shouldn't you have something more definite

15   than, discovery will bear us out?

16           MR. BERGER:  We do.

17           We have information that people are actually conducting

18   testing on our behalf, and we found that a lot of manufacturers

19   are the same and they also work in these same identical manners.

20           And in the most recent filing that we've made in our

21   opposition, we state that our investigation has uncovered that a

22   lot of the manufacturers are using the same original device

23   manufacturers to put the components together.

24           And in the Complaint itself, it states that the

25   components that are going into the computers are identical.

1   They are using the same Intel chips, the same microprocessors

2   and the same fans.

3        And in the EMC near the end, what it says is that in

4   evaluating whether joinder is appropriate, one of the factors to

5   look at is whether they are identical source components.

6        I think this is the third or the fourth factor that the

7   court gives.

8        And, in this case, we have a reasonable belief that

9   they are identical source components.

10       And, in addition, they are actually being put together

11  by the same manufacturers.  And additional discovery on this

12  issue would be able to determine whether joinder is appropriate.

13       But one of the problems is that if the Court were to

14  rule on joinder right now and sever out defendants, there is no

15  way to unring that bell as we go into the future.

16       So the best course of action that IpVenture believes is

17  to keep the defendants together, conduct discovery on this issue

18  and then we can address whether joinder is appropriate at a

19  future time.

20       Once we go down this path, there is no way to unring

21  the bell.

22       THE COURT:  I can't remember.  But EMC, it came up in

23  the same kind of context in the Motion to Sever and Transfer.

24  So, that must have been pretty early on in that case, too,

25  right?

1          MR. BERGER:  It was.  And that's why the court said

2    that severability wasn't appropriate.  And EMC, you had eight

3    defendants that were bringing that motion.

4          THE COURT:  That's what the District Court said?

5          MR. BERGER:  The District Court said -- I think the

6    District Court said that severability was appropriate.  They

7    should have been severed out.

8          THE COURT:  I think you got that backwards.

9          MR. BERGER:  Okay.

10         The Federal Circuit was saying that you had different

11   factors that the District Court should have looked at in

12   determining whether severability was appropriate.

13         THE COURT:  Right.

14         MR. BERGER:  What we would ask is that you apply those

15   same factors in this case, and to have limited discovery to

16   determine whether the components are common, whether the

17   manufacturers are common despite the fact that they are being

18   sold under different manufacturers' labels.

19         THE COURT:  I guess what I'm wondering is, and I looked

20   at the patent a little bit.  When you look at a patent a little

21   bit, you don't get much out of it.

22         But it seems that unless the fans and the processors

23   and switches and relays, if they all come from the -- the fact

24   that everyone may have an Intel processor, everyone may have a

25   fan made by, you know, by a Chinese fan company, if they are

1   putting a bunch of different components in.  Maybe that's what
2   goes into computers.
3          It doesn't seem to me at least that maybe exactly that
4   is what the Federal Circuit had in mind when they said identical
5   source components.
6          MR. BERGER:  In our investigations prior to filing
7   suit, we did a testing of the accused devices.  And one of the
8   things that we found is that between different manufacturers,
9   they were using a device what is known as a micro-controller.
10          A micro-controller was actually the device that was
11   interfacing between the processor and the fan, actually
12   controlling at a certain temperature.  So, when a computer got
13   to a certain temperature, it would increase the fan speed and
14   then reduce the processor speed in order to control temperature.
15          And when they were sharing the micro-controller between
16   different manufacturers, the behavior was identical.  And they
17   might have been small differences in terms of what the settings
18   were on for kicking in the fan when it would actually turn on.
19          But in terms of the functionality, any infringement of
20   the patents, it was identical in terms of how it worked.
21          This is something that additional discovery would tell
22   us more about, to the extent they are using the same
23   microprocessors and also the same ODM's.
24          THE COURT:  Same microprocessors and same?
25          MR. BERGER:  ODM's are original device manufacturers.

1    These are the large companies that are back in the Far East such

2    as Quanta, Foxconn and Winstron that put together most of the

3    computers that are then sold under different private labels

4    within the United States.

5            THE COURT:  Okay.

6            MR. BERGER:  So when somebody goes and buys a computer

7    and it's labeled as a HP computer or Sony computer, many times

8    Sony is not actually putting together the different components,

9    they are going to a third party that is acting on behalf of

10   multiple different manufacturers in the United States and making

11   computers and then placing a different label on those computers.

12           In our additional investigation also appears that many

13   of the manufacturers in the Far East are actually putting

14   together a lot of the specifications and the specific

15   specification for the computers.

16           And the U.S. companies are providing very, very broad

17   guidelines about what needs to go into a computer, particularly

18   with thermal management that is so specific for the computers,

19   for the components that are going in.

20           A lot of that is being directed by the ODM's such as

21   Foxconn or Winstron.  That's why we think it would be

22   appropriate to wait to make a severance determination until we

23   determine the degree to which the products are actually have

24   common components and are manufactured by the same plaintiffs.

25           THE COURT:  Are you hypothesizing that Dell and ASUS

1    and the other defendants in this case, that essentially, let's

2    assume the whole thermal management system is identical in each

3    of their computers?

4           MR. BERGER:  Yes.  We believe there's a high

5    probability that it is.

6           And to the extent that there are small changes, those

7    might just be settings within there, it was the manufacturers

8    putting in between different models, but that they actually do

9    not change the infringement of the patents and don't change the

10   actual functionality for how they work.

11          So, for example, one computer might say, Turn on the

12   fan at 56 degrees.  The next computer might say, Turn it on at

13   57.  Those differences might be because of the size of the

14   computer, the size of the memory that's going into the computer.

15          But in terms of the functionality of what the computer

16   is performing and the components that are going into the

17   computer, those are going to be identical between the different

18   manufacturers.  That is something take discovery is going to

19   provide us more information on.

20          THE COURT:  All right.

21          MR. BERGER:  When looking at the factors that are

22   pointed out in EMC, we think that's an appropriate step to take

23   at this time versus moving forward with severability.

24          Moving on to the transfer motion and Dell's argument on

25   transfer.

1          I would like to address something that people have said

2     which kind of goes to the heart of a lot of their arguments,

3     which is the fact that IpVenture is very much a non-practicing

4     entity.

5          THE COURT:  Yeah, yeah.

6          MR. BERGER:  I'll move on.

7          THE COURT:  I guess I'm interested in two things, one

8     of which is, did you write the briefs that are at issue here?

9          MR. BERGER:  I did.

10         THE COURT:  I noticed one thing that surprised me was

11    that IpVenture didn't site In re Link_A_Media in any of the

12    briefing.  Maybe I can understand why you didn't cite it in the

13    Dell briefing, but I don't know how you couldn't cite it in the

14    ASUS briefing.  I figure now is as good a time to tell me why

15    you think it's irrelevant.

16         MR. BERGER:  The reason we didn't cite it is that

17    actually had to do with reading some of your opinions that were

18    interpreting Link_A_Media.

19         What you said in In re Link_A_Media stood for the

20    proposition that where's a party had no ties to Delaware, and in

21    this case, you had said the Federal Circuit was basically saying

22    not that the plaintiff was fraudulently claiming Delaware, but

23    that their ties to Delaware were so limited because they

24    incorporated very soon before filing the litigation, and that

25    that was the only stance that the case really stood for, and In

1    re Link_A_Media really had no other reason why it was litigating

2    in Delaware.

3           We believe there are a lot of other reasons in our case

4    why we should have litigated in Delaware.

5           Now that I'm thinking about this a little more, we

6    probably should have distinguished In re Link_A_Media using that

7    argument.

8           I think the distinction would go along the following

9    lines, which is to say, the plaintiff in In re Link_A_Media

10   basically -- their only claim for bringing the case in Delaware

11   was the fact that they had they had incorporated two weeks or

12   two months prior in the state, and there was no other reason.

13          THE COURT:  I don't remember in In re Link_A_Media

14   saying anything about the plaintiff -- the defendant being

15   incorporated recently.

16          MR. BERGER:  I think they had.  I could check.

17          THE COURT:  I could check, too.

18          MR. BERGER:  They had a very limited connection.  And

19   the defendant in that case, I think, had a 130 employees.

20          They were not a large multinational company in which

21   suing them in a different locations would not be a hardship,

22   while in this case, Dell obviously can litigate in many, many

23   jurisdictions.

24          Dell actually over the last eight years in Delaware has

25   actually litigated twelve patent cases.

1          THE COURT:  From what I can see, it looks like all

2     twelve of them Dell was sued in Delaware.  It's not like

3     Delaware was Dell's forum.

4          MR. BERGER:  They didn't bring a Motion to Transfer.

5          THE COURT:  To me that's irrelevant other than for the

6     point that I guess what you're making it for, which is, Yeah,

7     they have the capacity to litigate in Delaware.

8          If they want to not bring a Motion to Transfer in

9     twelve and there is one where they think, Gee, we have these

10    three ex-employees that are in the Western District, it may be

11    hard to get to them here.

12         They don't really need a reason to do something

13    different one time and the next time.  You have to judge what

14    they are doing here on its individual merits.

15         MR. BERGER:  Yes.  But there's a number of Delaware

16    court opinions that have said that for a multinational, there's

17    a much higher bar for them actually to move to transfer.  In

18    other words, they must show some kind of unique harm they will

19    undergo.

20         THE COURT:  I don't think you'll find it that I've said

21    that in any of mine.  But I do listen to what my colleagues say.

22         MR. BERGER:  There is also Robocast where that point

23    was made in there that for a multinational, that really has the

24    capability of litigating in many, many jurisdictions.  And also

25    Dell has litigated in Chancery Court here and has been

1    incorporated in the State of Delaware for 25 years at this

2    point.

3              THE COURT:  Dell is a real Delaware corporation.  No

4    doubt about that.

5              MR. BERGER:  Let me address one of the issues that it

6    sounds like you were interested in, which was the three

7    employees.

8              THE COURT:  Yes, I'd like to here about that.

9              MR. BERGER:  With the three employees there are a

10   couple of issues.  The first is that they have selected three

11   employees, I think, out of a total of 15,000 employees in Round

12   Rock.

13             They have never said that their defense would be so

14   much hindered by not being able to call these three employees,

15   but that these three employees amongst the 15,000 are very

16   knowledgeable, but unfortunately these 3 employees no longer

17   work at Dell.  But there are likely to be many, many other

18   employees who could probably testify on the same issue.

19             THE COURT:  I didn't read the Declaration, whatever it

20   says about exactly these three people.  Sometimes when I read

21   Declarations, I see they are very carefully worded. So, yeah,

22   maybe they have a thousand people in the thermal management

23   unit.  Yes, three of them don't work anymore.  Who cares?

24   Sometimes they are the three main people.  Since I didn't read

25   it, I don't know.

1          You've read it.  Does it say they are important people?

2     How is it couched?

3          MR. BERGER:  I think it said they were important.  They

4     are very knowledgeable on the issue.  They had information on

5     the issue.  But that does not mean that they are the only people

6     that Dell would be able to produce on that.

7          THE COURT:  We haven't had a Rule 16 Conference in this

8     case, have we?

9          MR. BERGER:  No, we have not.

10         The other issue is, we would still be able to depose

11    those witnesses in Texas at a place of their convenience.

12         At the point if we get to trial this could be a year,

13    or several years down the road from now and to make a

14    determination at that point.

15         In addition, it's not clear that those witnesses are

16    going to have information on Dell's current implementation of

17    their thermal management technology.  The patents are covering

18    computers that are being made today.

19         THE COURT:  You're going back six years.  You're

20    interested in what they were doing not just today, right?

21         MR. BERGER:  We would be interested in both issues.

22         We'd also interested in the computers that Dell was

23    making in the period after those employees have retired from

24    working at Dell.

25         THE COURT:  Does it say when they left Dell?

1          MR. BERGER:  I do not know.

2          THE COURT:  Basically, your view of the three Dell

3    ex-employees is that you are not convinced that they are really

4    critical people to show up in Delaware?  I take it you do agree

5    based on what's been said, they could not be compelled to show

6    up in Delaware?

7          MR. BERGER:  It's also not clear that they would not be

8    willing to show up in Delaware, or be compelled.  They are still

9    living in the Round Rock area.  I don't know if they still have

10   ties to Dell of some sort even though they are no longer

11   employed by Dell.

12         THE COURT:  It seems to me, the case law generally is

13   they do sometimes refer to people agreeing to show up.  In the

14   end, the only way you can be sure they are going to show up is

15   to subpoena them.  You can't subpoena three people in Texas to

16   show up in Delaware, right?

17         MR. BERGER:  We could depose them in Texas.

18         THE COURT:  You could depose them.

19         I take it you would agree that deposing, assume they

20   are the sort of people that Dell would want the jury to see,

21   that a video deposition isn't as good as an in person

22   appearance?

23         MR. BERGER:  I don't know.  We'd have to see what

24   happens.

25         THE COURT:  All right.

1          Just in terms of the transfer, I take it there's no

2   dispute you could have sued Dell in the Western District of

3   Texas if you wanted to?

4          MR. BERGER:  We could have.  We made a decision to sue

5   in Delaware because a large number of the defendants in the suit

6   are incorporated in Delaware.

7          THE COURT:  I have no doubt that you had a legitimate

8   reason.  I think that's the word that's used, reason for picking

9   Dell as a venue.  I think the plaintiff sues a bunch of

10  different defendants, many of them actually in one jurisdiction.

11         Just tell me something about IpVenture.  Is it the case

12  that you are, which I saw somewhere, your one and only office is

13  in the Northern District of California?

14         MR. BERGER:  Yes, that's correct.

15         THE COURT:  Besides, I think it was Dr. Tong and Mr.

16  Thomas.  Are there any other employees?

17         MR. BERGER:  There are not.

18         Particularly for IpVenture, how do you litigate a case

19  in multiple different jurisdictions that's going to wind up

20  being on the same patents and also, you know, involve like what

21  we contend is newly identical products, is going to be very,

22  very cumbersome, and also for the court system risk of different

23  inconsistent rulings.  They could be different Markman rulings.

24  They could be different invalidity rulings on the same patents

25  that are at issue.

1          One of the things that sets this case apart from a lot

2   of the other cases on transfer is that we are raising the same

3   four patents and same claims on those patents against all of the

4   different defendants.

5          So transferring out one defendant or two defendants

6   into different jurisdictions runs the risk that those

7   jurisdictions will be going ahead with the case as will this

8   Court.  There will be no real efficiency gained.

9          In fact, it will be less efficient for the Federal

10  Court system.  You would also have third party witnesses that

11  might now have to be deposed two times or three times depending

12  on how many jurisdictions the case goes forward.

13         That is something that was not addressed in Dell's

14  arguments.  That's something that was in our briefing that's

15  kind of the real heart of this, which is that there is no

16  advantage, but actually there is a lot of difficulty that could

17  wind up arising by having inconsistent court rulings coming

18  forward and also taxing these third party witnesses with

19  multiple depositions.

20         THE COURT:  All right.  Is there anything else that you

21  want to say about the Dell case?

22         MR. BERGER:  I think that's it for now.

23         THE COURT:  Let me hear from the ASUS attorney for a

24  few minutes.

25         MR. ENGLE:  Would I go first?

1           THE COURT:  It might make sense.

2           MR. ENGLE:  I'm happy to do it however your Honor

3     prefers.

4           THE COURT:  Just come up.  You don't have to speak

5     long.

6           Presumably, your argument on severance, even though you

7     present it differently, but it is basically identical to Dell's

8     argument, right?

9           MR. ENGLE:  That's right.  I think the issues are

10    fundamentally the same.

11          THE COURT:  In terms of the transfer though, you've got

12    the better position because, I think your Declaration said

13    that -- somebody's Declaration said 93 percent of ASUS's U.S.

14    corporation, ASUS employees are in California?

15          MR. ENGLE:  That's correct, your Honor, its in the

16    Northern District of California.

17          THE COURT:  Where are the other seven percent?

18          MR. ENGLE:  I believe they are scattered in a few

19    different locations.

20          THE COURT:  Are they like sales people?  Do you know

21    what kind of people they are?

22          MR. ENGLE:  I believe it's warehousing.

23          THE COURT:  They warehouse in Florida and somewhere

24    else.

25          MR. ENGLE:  They have a facility in the Midwest as

1    well.

2         THE COURT:  Besides the fact that your factual

3    situation seems analogous to In re Link_A_Media, is there

4    anything else in particular that you want to draw my attention

5    to, or why I should transfer to the Northern District of

6    California?

7         MR. ENGLE:  Sure, your Honor.  There are just a few

8    points I would make.

9         The first is that In re Link_A_Media, the plaintiff was

10   not a Delaware corporation.  It was the defendant that was the

11   Delaware corporation.  I think you're well aware of that.

12        THE COURT:  That's hazy.  I knew it wasn't a recently

13   formed Delaware corporation.  I couldn't remember.  I don't

14   recall there being any suggestion actually that In re

15   Link_A_Media that either of the defendants -- either of the

16   parties was anything other than the plaintiff was a Bermuda

17   corporation with a subsidiary in San Francisco.  Call.  That

18   didn't sound like a big deal.

19        I think the defendant was Marvel.

20        MR. ENGLE:  Marvel was the plaintiff.  Link_A_Media was

21   the defendant.

22        THE COURT:  Maybe Link_A_Media isn't that big a

23   corporation.  Of course, they weren't the ones who -- they are

24   the only ones that wanted to be in Delaware, right?

25        MR. ENGLE:  Yes, your Honor.

1          Actually, the point about IpVenture being a small two

2     man operation makes more sense for it to be in the Northern

3     District of California where they are.  That way they would be

4     right there for trial.  They wouldn't have to spend time

5     traveling back and forth to Delaware.

6          THE COURT:  But they would be racking up the frequent

7     flyer miles on these other defendants' cases.  I'm sorry.

8        Is there anything else you want to say?

9          MR. ENGLE:  So, I think as compared to Dell, Dell

10    focuses on Dell witnesses.

11          Now, Dell witnesses are not going to be an issue in the

12    case against ASUS.  You can't have Dell component product

13    knowledgeable people say anything about ASUS's products where as

14    ASUS's witnesses are is either in California or significantly

15    closer to California than Delaware.

16          Moreover, there is also third party witnesses.  For

17    example, prior art witnesses.

18          In this particular case, using one of the patents

19    alone, we've already identified 40 patents with named inventors

20    in the Northern District of California.  None of the name

21    inventors on the patents-in-suit are in Delaware.

22          THE COURT:  To the extent that you want to, you're

23    going to depose those people and 99 percent of them after you

24    depose them, you never hear from them again?

25          MR. ENGLE:  While that maybe true, there only needs to

1   be at least one or several key prior art witnesses.  If they are

2   in the Northern District of California, which looks like given

3   the number of patents that IpVenture presumably thought were the

4   most relevant to their patents when they cited them to the

5   Patent Office, then those third party witnesses, whichever ones

6   we end up using, wouldn't have to travel more than 2000 miles to

7   Delaware.  It is those unrelated third party witnesses who are

8   the least likely to want to travel.

9       THE COURT:  Thank you.  Why don't I hear from Mr.

10   Berger again as to why ASUS doesn't have a better case for

11   transfer than Dell.

12       Maybe you will concede that they have a better case but

13   not good enough?

14       MR. BERGER:  I think we would actually concede that.  I

15   think the difference between ASUS and Dell in terms of their

16   position, ASUS is not incorporated in the State of Delaware and

17   is incorporated in the Northern District of California, which

18   puts them in a slightly better position.

19       However, IpVenture's position is that in both cases

20   transferring does not -- it winds up being more inefficient for

21   the courts and also does not really confer a benefit on the

22   parties in terms of costs.

23       A lot of the costs going forward would be during the

24   discovery.  And during that point, the location of the case is

25   not going to matter.

1          Another issue is the location of witnesses.  Dell has

2    stated that they have witnesses in the Western District of

3    Texas.  ASUS's says the Northern District of California.

4          We noted in our briefing that one of the named

5    inventors, Alan Thomas, on the patents is located in Ocean City,

6    New Jersey, which is close to Delaware.

7          THE COURT:  Do you know how old Alan Thomas is?

8          MR. BERGER:  He's 75 years od, which would be another

9    factor having the case maintain itself here in Delaware.

10          So that extent, you know, the location of witnesses

11   becomes if anything a wash.  We would urge the Court at that

12   point to look at the efficiency of maintaining the case in one

13   location.

14          THE COURT:  This is in relation to somebody's argument,

15   I don't know who's, but Alan Thomas, Ocean City, New Jersey.  He

16   is the father of one of the principals in the company?

17          MR. BERGER:  Yes, he's the father of Doug Thomas, who

18   is also named on the patents.

19          THE COURT:  If there is ever somebody who was going to

20   make an effort to travel when they didn't have to would probably

21   be him?

22          MR. BERGER:  It would be.

23          THE COURT:  So, just going back now.  In the end, is it

24   your argument on ASUS boil down to -- your best argument is

25   essentially it's inconvenient to -- inefficient to split this

1    case into multiple pieces?

2          MR. BERGER:  I think that's the main argument that we

3    would report, particularly ASUS, because splitting the case into

4    two jurisdictions on the same patents on nearly identical

5    products is going to really run a risk of both being cumbersome

6    for IpVenture, the plaintiff and also to third party witnesses

7    as we stated before, and risk, you know, contradictory rulings

8    where there is going to be a Markman, invalidity, even discovery

9    issues as those wind up coming up.

10         THE COURT:  But the Federal Circuit has approved lots

11   of transfers where one party stays in one location and somebody

12   -- some other party goes to a different location, right?

13         MR. BERGER:  They have in some cases.  But I think in

14   many of those cases, I would have to look back at the briefing.

15         Many times there are different patents sometimes at

16   issue between the different parties.  And the Federal Circuit, I

17   think, this is in our opposition to the Dell Motion to Transfer.

18         We said in a number of Federal Circuit opinions in

19   which they said that judicial efficiency os of paramount

20   importance in determining a Motion to Transfer.

21         And in this case, where you have the same patents at

22   issue and you would be going forward with them.

23         THE COURT:  Don't they usually say that in the context

24   of where there's some Judge, some court that has already gotten

25   into it, which is not occurring here?

1          MR. BERGER:  Looking down the road where we would have,

2     you know, let's say six months from now, it would be the same

3     inefficiency question issue.

4          Although, you're right, many times inefficiency in a

5     transfer motion would arise where a Judge has expertise with

6     those patents.

7          And you can see a similar situation where you have

8     taxing two different courts with the task of wind up figuring

9     out how to interpret patents.  And that in some ways would raise

10    the same inefficiency.  It might even be more inefficient at

11    that point, because you would be asking two courts to get

12    completely up to speed while if do a transfer at an early stage

13    in the litigation, the second court could basically use the

14    learnings of the first court in order to inform them.

15         While in this case, you're asking both courts with

16    conducting, you know, almost identical litigations and identical

17    products.  And that would be inefficient.

18         One thing I would like to say that if the court does

19    decide to sever, but keep defendants in this jurisdiction, we'd

20    ask that the court reference the cases together.

21         THE COURT:  If I sever them -- I've already done this

22    in some other cases.  If people are staying here, they are going

23    to be continued to be grouped for case management purposes.

24         My view of things is, you move for a severance if you

25    are actually going to have a trial right up until the end.  I

1    presume people would.

2          If you're talking about the same patents, et cetera,

3    certainly makes sense to do most of the stuff together so nobody

4    is prejudiced too much.  I would definitely do that.

5          All right.  Is there anything else anybody wants to say

6    about anything?

7          MR. ANDERSON:  Briefly, your Honor.

8          MR. BERGER:  Thank you, your Honor.

9          MR. ANDERSON:  With all due respect to counsel, I think

10   that the analytical framework that he's looking at the transfer

11   issue is muddled.

12         The severance issue has to be decided independently of

13   the 1404(a) issue.  And by that I mean that if severance is

14   appropriate then all of the Juris Prudence teaches that the

15   1404(a) analysis looks at the severed case.  In other words,

16   IpVenture versus Dell.  And there the factors are weighed.

17         What I heard counsel from IpVenture said today is

18   trying to avoid transfer by bootstrapping on to perceived

19   efficiencies gained from the improper joinder, and that, I

20   believe, is intelligently incorrect.

21         And you have to first decide whether severance is

22   appropriate and, then if that's the case, then you look at the

23   1404(a) factors based on the stand alone set of cases.  And I

24   just heard that whole analysis with all due respect, muddled.

25         The other point that I wanted to make is that all of

1    the teachings including the 3rd Circuit, hold that the Rule 20

2    joinder determination is made on the basis of the pleadings.

3         We've cited those cases including the 3rd Circuit cases on

4    page four of our reply brief.

5              THE COURT:  Hold on one second.

6              MR. ANDERSON:  I won't read those.

7              THE COURT:  Hold on one second.

8              MR. ANDERSON:  Okay.

9              THE COURT:  The reply brief?

10             MR. ANDERSON:  Yes.

11             THE COURT:  Brief number three in the series.

12             MR. ANDERSON:  Our reply brief.  That would be Docket

13   Number 111.

14             THE COURT:  All right.  That's a useful point to bear

15   in mind.

16             MR. ANDERSON:  So there isn't a, Well let's kick the

17   can down the road, we could have, should have, we might be able

18   to, let something different test.  The test is what did they

19   allege in their Complaint?

20             Counsel again, with all due respect, took some rather

21   remarkable liberties in arguing today -- in making argument that

22   are not in the Complaint.

23             All that is in the Complaint is an allegation that the

24   defendants all infringe the same patent and that they may use

25   some common element.  That's it.  That doesn't meet either

1    prong.

2           THE COURT:  I do think Mr. Anderson has a point about

3    what you said that it does exceed what's in the Complaint.

4           Of course, at the time you wrote the Complaint maybe

5    you had the AIA in mind, maybe you didn't.  You couldn't have

6    had EMC in mind, which I suppose brings up the question of when

7    I should figure out these Motions to Dismiss and issue those

8    orders and see if the allegations in the Complaint change any,

9    because I guess -- I take it that -- I haven't seen on the whole

10   in these patent cases people tending to allege any facts more

11   than they think are certainly necessary.  Very skimpy most of

12   the time.

13          But your point is, I do agree with you, what he says,

14   the argument today certainly exceeded what is in the Complaint.

15          I think what's in the Complaint really is, you know, no

16   disrespect to Mr. Berger, computers, maybe all the fans come

17   from the same place.

18          I don't think the Complaint really meets what EMC was

19   talking about, particularly, as you point out, basically, we're

20   looking at what does the Complaint say?

21          MR. ANDERSON:  To be sure you couldn't have had the

22   benefit of EMC.  But EMC would have confirmed what is apparent

23   from a plain reading, the AIA and Rule 20, namely, it's a two

24   prong test.

25          THE COURT:  You say plain reading.  There are a lot of

1  courts weren't treating it as a two prong test.

2          MR. ANDERSON:  Well, Judge, it says paragraph A and B.

3          THE COURT:  I know what it says.  I agree with you.

4          MR. ANDERSON:  It has and in it.

5          THE COURT:  I always thought it was a two prong test.

6  I'm just telling you though that a lot of judges --

7          MR. ANDERSON:  I'm looking at the rule right now.  It

8  says and, not or.

9          THE COURT:  Okay.

10          MR. ANDERSON:  The first paragraph, before the and,

11  says that you have to allege a right to relief jointly,

12  severally or in the alternative.  And that is not alleged in

13  IpVenture's Complaint against Dell.  Enough on that.

14          I think the final point I wanted to make is that the

15  big thing I heard counsel say was the difference with Dell here

16  is that Dell has incorporated in Delaware.

17          I read that In re Link_A_Media case to say that the

18  defendants place of incorporation is entitled to little weight

19  when all the witnesses and documents are elsewhere.

20          I think your Honor made the same observation.

21          THE COURT:  I think that's what In re Link_A_Media

22  said.

23          MR. ANDERSON:  That's how I read it.  I think you made

24  the same observation.

25          THE COURT:  It is kind of a differ situation when, you

1   know, In re Link_A_Media like ASUS now wanting to take the

2   plaintiff to plaintiff's home turf.  There's not a lot of

3   plaintiff's argument about it being unfair.

4        You want to go some place that's not there, not their

5   home turf.  In fact, I'm trying to recall.  Doesn't Dell have a

6   big operation in the Northern District California?

7        MR. ANDERSON:  I don't know that I would characterize

8   it as big.

9        I think they have an office that supports their

10  mobility products.  These are handsets and tablets that I do not

11  believe are accused in this case.  I could be wrong about that.

12  But that's my understanding.

13       THE COURT:  In the back of my mind I think in some

14  other Dell case, I think I heard that they had.  I think I've

15  had some Dell case -- is it possible that I had some other Dell

16  Motion to Transfer to the Northern District of California?

17       MR. ANDERSON:  I think you had that in the Round Rock

18  case.

19       THE COURT:  I didn't rule on that, I don't think.

20       MR. ANDERSON:  I'm just saying if that's all they've

21  got, it's not a factor that is entitled to anyway weight when

22  the witnesses and documents are elsewhere particularly with the

23  important critical witness.

24       I've done apparently more due diligence these folks

25  have done.  I've determined that our critical witnesses are in

1   the Western District of Texas.  There aren't any here.  They

2   don't have any here.

3          Jurisdiction has no connection with this case other

4   than Dell is incorporated here, and if In re Link_A_Media says

5   nothing else, it says that fact is not entitled to much weight

6   when the witnesses and documents are elsewhere.

7          THE COURT:  Okay.

8          MR. ANDERSON:  I really that disposes of that argument.

9          That's all I have.  I don't mean to gild the lilly.

10          I thank your Honor for your time today.

11          THE COURT:  I'm going to take this all under

12   advisement.

13          I think I may try to do the orders on the Motions to

14   Dismiss first.  It doesn't strike me that there is actually

15   anything unfair.  They are going to be probably without

16   prejudice.

17          There is actually nothing unfair about giving the

18   plaintiff a chance to allege whatever they think they need to

19   allege.  But I'm not sure what I'm going to do.

20          In any event, when I issue some orders, whatever it is

21   I do, okay?

22          Thank you all for coming.

23          (At this time, the hearing concluded)

24

25